IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| MICHAEL STENGLE, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 05-0725-CV-W-ODS |
| AMERICAN ITALIAN PASTA CO., et al., | ) ) ) | |
| Defendants. | ) ) | |
| MATT BRODY, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 05-0730-CV-W-ODS |
| AMERICAN ITALIAN PASTA CO., et al., | ) ) ) | |
| Defendants. | ) ) | |
| GEORGE CLARK, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 05-0769-CV-W-ODS |
| AMERICAN ITALIAN PASTA CO., et al., | ) ) ) | |
| Defendants. | ) ) | |
| CORRINE ROTHSTEIN, on behalf of American Italian Pasta, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 05-0909-CV-W-ODS |

| | |
|---|---|
| TIMOTHY S. WEBSTER, et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |
| ROLF FASTH, derivatively and on behalf of and for the benefit of American Italian Pasta, | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | )    Case No. 05-0928-CV-W-ODS |
| | ) |
| TIMOTHY S. WEBSTER, et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |
| RONALD CORALLO, derivatively and on behalf of and for the benefit of American Italian Pasta, | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | )    Case No. 05-0996-CV-W-ODS |
| | ) |
| TIMOTHY S. WEBSTER, et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |
| FIREFIGHTER'S PENSION SYSTEM OF THE CITY OF KANSAS CITY, MISSOURI, on behalf of American Italian Pasta, | ) ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | )    Case No. 05-1139-CV-W-ODS |
| | ) |
| WILLIAM R. PATTERSON, et al., | ) |
| | ) |
| Defendants. | ) |

These putative class action cases allege, *inter alia*, various violations of the Securities Exchange Act. Pending are multiple motions for extension of time, consolidation, appointment of lead plaintiff(s), and approval of selection of lead counsel. Also pending are two motions to dismiss filed by the original plaintiffs in Case Nos. 05-0725-CV-W-ODS and 05-0730-CV-W-ODS.

## I.  MOTIONS TO DISMISS

The two motions to dismiss present an administrative problem for the Court. The two plaintiffs indicate they wish to dismiss essentially because they realize they will not qualify as lead plaintiffs in this case. The Court finds their effort to minimize confusion and litigation laudable; unfortunately, given that these were the first two cases filed, other parties have filed relevant documents and materials in one or the other of the two cases (primarily, of course, the first one). In order to insure the record is complete, the Court declines to dismiss the cases; instead, the Court will treat the plaintiffs' motions as an indication that they do not wish to be lead plaintiffs.

## II.  MOTIONS TO CONSOLIDATE

The Private Securities Litigation Reform Act ("PSLRA") requires the Court to address outstanding motions to consolidate before appointing lead plaintiff(s). 15 U.S.C. § 78u-4(a)(3)(B)(ii). There are multiple motions to consolidate.

The only issue involves an attempt by some plaintiffs to characterize their claims as "derivative claims" instead of securities claims. The combined effects of the PSLRA and the Securities Litigation Uniform Standards Act ("SLUSA") renders the titles and labels ascribed by the parties irrelevant.

3

> In recent years, Congress passed two statutes designed to alleviate the problems corporations suffered as a result of class action lawsuits. The first of these, the PSLRA, was designed to curb abuse in securities suits, particularly shareholder derivative suits in which the only goal was a windfall of attorney's fees, with no real desire to assist the corporation on whose behalf the suit was brought. The PSLRA immediately drove many would-be plaintiffs to file their claims in state court, based on state law, in order to circumvent the strong requirements established by the statute. Motivated by [a purpose] to keep such lawsuits in federal court, Congress quickly passed SLUSA in order to prevent plaintiffs from seeking to evade the protections that federal law provides against abuse litigation by filing suit in State, rather than federal, courts. With some exceptions, SLUSA made the federal courts the exclusive fora for most class actions involving the purchase and sale of securities.

Green v. Ameritrade, Inc., 279 F.3d 590, 595-96 (8th Cir. 2002) (quotations omitted). The four so-called "derivative suits" all allege "misrepresentation or omission of material fact in connection with the purchase or sale of a covered security" or that an individual "defendant used or employed [a] manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security," 15 U.S.C. § 78bb(f)(1), so those four suits are governed by the SLUSA. In addition to focusing on the falsity of public statements, the Complaints emphasize loss in AIPC's stock value, not loss in income or assets belonging to AIPC. While the Complaints seek a reimbursement to AIPC of all money it "lost," the Complaint does not suggest the company lost any money as a result of the alleged misrepresentations that form the focus of the claims. In short, these Complaints seek damages for fraud in connection with the sale of the company's stock under the guise of a claim certain officers and officials failed to act in the company's best interests.

The Court interprets the PSLRA and SLUSA as acting in concert to require all litigation regarding American Italian Pasta Company's ("AIPC") stock price to be litigated in one forum and in one suit. All of the cases share both factual and legal issues, and consolidation will streamline matters and prevent needless confusion, expense, and delay. Therefore, consolidation is appropriate under Rule 42(a) of the Federal Rules of Civil Procedure. All cases listed in the caption of this Order are consolidated under Case

4

No. 05-0725-CV-W-ODS, which will be re-captioned as "In re American Italian Pasta Company Securities Litigation."

### III. APPOINTMENT OF LEAD PLAINTIFF

The Court has received multiple Motions for Appointment as Lead Plaintiff. In addition, the Court deems the filing of a Complaint in any action filed subsequent to the first case filed as a Motion for Appointment as Lead Plaintiff(s) unless the plaintiff(s) filed a separate Motion for Appointment as Lead Plaintiff. Under the PSLRA, the Court shall appoint as lead plaintiff(s), the member or members of the class that it "determines to be most capable of adequately representing the interests of the class members. . . ." 15 U.S.C. § 78u-4(a)(3)(B). The most adequate plaintiff is the person or group of persons that has complied with the following requirements:

(1) Publish, in a widely circulated national business-oriented publication, a notice advising members of the purported plaintiff class of the pending action;

(2) Has the largest financial interest in the relief sought by the class; and

(3) Otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. §§ 78u-4(a)(3)(A), 78u-4(a)(3)(B)(iii). There is no dispute that the publication requirement has been satisfied, so the Court will examine the second and third criteria.

### A. Largest Financial Interest

When it enacted the PSLRA, "Congress sought to create mechanisms to ensure the protection of class members' interests in securities litigation that was widely perceived as being lawyer-instituted and lawyer-driven." In re BankAmerica Corp. Sec. Litig., 350 F.3d 747, 751 (8th Cir. 2003) (citing In re Cendant Corp. Litig., 264 F.3d 201,

254-68 (3d Cir. 2001)).  The PSLRA provides this protection by requiring the Court to appoint a lead plaintiff or group of lead plaintiffs in accordance with the statute.

The movant(s) with the largest financial interest is presumptively the lead plaintiff(s).  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  This presumption may be rebutted by a showing that the presumptive lead plaintiff(s): (1) will not fairly and adequately protect the interests of the class, or (2) is subject to unique defenses that render such plaintiff incapable of adequately representing the class.  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

Ascertaining the movant with largest financial interest requires ascertaining (or, more precisely, predicting) the opening and closing dates for the class period.  The opening date for the class period is not seriously disputed and is agreed by all concerned to be October 25, 2000.  The actual opening date will be resolved with the filing of a consolidated complain.  The closing date for the class period is the subject of serious disagreement.

> In determining the termination of the class period, the court believes that the appropriate test is that "liability under the securities acts is terminated when curative information is publicly announced or otherwise effectively disseminated."  In essence, that test is a preliminary merits determination whether the facts which underlie the gravamen of the plaintiff's complaint continue to represent a reasonable basis on which an individual purchaser or the market would rely.

In re Data Access Sys. Sec. Litig., 103 F.R.D. 130, 143 (D. N.J.,1984) (quoting McFarland v. Memorex Corp., 96 F.R.D. 357, 364 (N.D. Cal. 1982)).

Most plaintiffs posit August 9, 2005, as the closing date for the class.  After the market closed on that day, AIPC announced (1) a $60.7 million charge, (2) the commencement of an SEC inquiry into accounting improprieties and suspicious stock transactions in late 2004 and 2005, (3) a delay in issuing financial results for the quarter ending July 1, 2005, and (4) a delay in filing its third quarter 10-Q with the SEC.  The next day, AIPC's stock price closed $7.15 lower, a drop of approximately 33.5%.

6

Some movants emphasize other events and dates between October 2000 and August 9, 2005, but none suggest a date other than August 9, 2005, as the closing date for the class. These arguments will be discussed later in Part II(B), below. For now, it is sufficient to simply state the class period runs from October 25, 2000 to August 9, 2005.

The Court must next determine exactly who is applying to be the lead plaintiff case. One group is a combination of the (1) New Jersey Building Laborers Pension and Annuity Funds and (2) the City of Tulsa, Oklahoma Municipal Employees Retirement Plan. Another group is a combination of (1) the San Antonio Fire & Police Pension Fund, (2) the Jacksonville Police & Fire Pension Fund, (3) the Park Employees' Annuity & Benefit Fund of Chicago, and (4) the Teachers' Retirement System of Louisiana. The latter group has identified itself by the title "U.S. Public Pension Funds," but this title appears to have been adopted solely for purposes of this litigation. The third group consists of funds from three locals of the Iron Workers.

The PSLRA contemplates the appointment as a person or "group of persons" as lead plaintiff, but it does not define "group." Nevertheless, most courts have determined that the appointment of a group of unrelated plaintiffs is not appropriate under the PSLRA. See In re Conseco, Inc. Sec. Litig., 120 F. Supp. 2d 729, 733 (S.D. Ind. 2000); Aronson v. McKesson HBOC, Inc., 79 F. Supp. 2d 1146, 1153 (N.D. Cal. 1999); In re Texlon Corp. Sec. Litig., 67 F. Supp. 2d 803, 816 (N.D. Ohio 1999); In re Donnkenny Inc. Sec. Litig., 171 F.R.D. 156, 157-58 (S.D.N.Y. 1997); see also In re Cendent Corp. Litig., 264 F.3d 201, 266-67 (3d Cir. 2001). The Court agrees with the reasoning of these decisions and concludes that granting a request to appoint an unrelated group of investors would violate the purposes behind the PSLRA, which includes the prevention of lawyer-driven litigation. Organizing disparate combinations of shareholders for the purpose of aggregating the "most damage" is contrary to the spirit and purposes of the Act, and it is unreasonable to construe the PSLRA's reference to a "group" as meaning a "group of otherwise disinterested and disconnected parties." Indeed, the argument posited by the "U.S. Public Pension Funds" demonstrates the point: they argue they

7

should be considered a single group simply because each is a public fund and each has a "common goal in serving as lead plaintiffs." These or similar representations could be made by virtually any combination of investors. The PSLRA is not intended to allow lawyers or shareholders to manipulate different factions in order to generate an appealing plaintiff.[1]

The Court will consider the entities making up the first two groups separately. In contrast, the three separate locals of the Iron Workers are connected by a prior relationship that includes their financial dealings in their pension funds, so they will be considered together.

The PSLRA does not articulate the procedure for determining the largest financial interest among the competing movants. However, a four-factor inquiry has been recognized or adopted by various courts. See In re Enron Corp. Sec. Litig., 206 F.R.D. 427, 440 (S.D. Tex. 2002); In re Olsten Corp. Sec. Litig., 3 F. Supp.2d 286, 295 (E.D.N.Y. 1998); In re Nice Sec. Litig., 188 F.R.D. 206, 217 (D. N.J. 1998). The four factors are: (1) the number of shares purchased; (2) the number of net shares purchased; (3) the total net funds expended by the plaintiffs during the class period; and (4) the approximate losses suffered by the plaintiffs. Enron Corp. Sec. Litig., 206 F.R.D. at 440.

The Court has reviewed the competing motions for appointment of Lead Plaintiff along with the suggestions and exhibits. In light of the Court's rulings discussed above and various parties withdrawing their requests,[2] the following candidates remain:

---

[1]The Court's ruling also insures that, despite the members' present avowals of harmony, there will be no risk of serious disagreement among the group's members at a later time.

[2]The IBEW Local 98 Pension Fund withdrew its request to be Lead Plaintiff on October 26, 2005. Thomas Mayer and the Wayne Hummer Growth Fund withdrew their request to be Lead Plaintiff on October 25, 2005. Despite filing a lawsuit of his own, Rolf Fasth has asked that Ronald Corallo be designated the Lead Plaintiff, thereby indicating he does not wish to be so designated.

8

A. The New Jersey Building Laborer's Pension and Annuity Funds, which claims losses of approximately $258,467.

B. The City of Tulsa, Oklahoma Municipal Employees Retirement Plan, which claims losses of approximately $138,723.

C. The San Antonio Fire & Police Pension Fund, which claims losses of approximately $1,025,334, but sold all of its shares in AIPC by September 10, 2004 and did not own any shares on August 10, 2005.

D. The Jacksonville Police & Fire Pension Fund, which alleges losses of approximately $177,555, but sold all of its shares in AIPC by November 2, 2004, and did not own any shares on August 10, 2005.

E. The Park Employees' Annuity & Benefit Fund of Chicago, which claims losses of approximately $146,467.

F. The Teachers' Retirement System of Louisiana, which claims losses of approximately $728,226.

G. Iron Workers Local # 40, #361 & # 417 Union Security Funds, which claims losses in the amount of $318,258.

H. George Clark has not participated in these proceedings since he filed his Complaint. His Complaint provides no information about the losses he allegedly suffered.

I. Corrinne Rothstein represents that she owns 16,500 shares of AIPC and that she began owning stock in the company in June 1999. However, she does not indicate when she purchased her shares or the price(s) she paid.

J. Ronald Corallo owns an unspecified number of shares and asserts that he began owning stock in AIPC in November 1999. Like Rothstein, however, he does not provide details about his transactions.

K. Firefighters' Pension System of the City of Kansas City, Missouri, which claims losses of approximately $50,000.

Clark and Corallo cannot be considered because the Court has no information regarding the extent of their ownership of AIPC stock or their potential losses. Rothstein cannot be considered for the same reason; while she currently owns 16,500 shares, this fact alone is insufficient to evaluate her potential losses. Moreover, Rothstein and Corallo have chosen counsel who, based on their written filings in this Court, have demonstrated a substantial propensity for ad hominem and personal attacks, particularly with respect to each other. The Court has no patience for such conduct and is particularly reluctant to deem those who engage in such actions "adequate" for purposes of representing a class of investors.

The Court also excludes The Teachers' Retirement System of Louisiana ("Teachers' Retirement") from consideration. "Except as the court may otherwise permit, consistent with the purposes of this section, a person may be a lead plaintiff . . . in no more than 5 securities class actions brought as plaintiff class actions pursuant to the Federal Rules of Civil Procedure during any 3-year period." 15 U.S.C. § 78u-4(a)(3)(B)(vi). Teachers' Retirement is currently serving as a lead plaintiff in at least six actions and is therefore defined as a "professional plaintiff" whose application to be lead plaintiff is disfavored by the statute. Teachers' Retirement contends the legislative history indicates the disapproval of "professional plaintiffs" was not intended to apply to institutional investors, but the plain language of the statute contains no such exclusion. Teachers' Retirement also argues the statute permits the Court to appoint a professional plaintiff if deemed appropriate. The statute indicates this argument is correct; however, the statute also represents Congressional disapproval of such a practice. Thus, the Court should not lightly appoint a professional plaintiff, and in this case there is no need to do so. There are several other investors who can adequately represent the class; consequently, there is no need to act contrary to the policies Congress has espoused. Cf. Enron, 206 F.R.D. at 456-57.

The San Antonio Fire & Police Pension Fund ("San Antonio") has the largest financial interest and, therefore, is presumptively the lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). However, this presumption may be rebutted by a showing that the

10

presumptive lead plaintiff: (1) will not fairly and adequately protect the interests of the class, or (2) it is subject to unique defenses that render it incapable of adequately representing the class. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). Because these factors are intertwined with the requirements of Rule 23, which must also be met by the lead plaintiff(s), the Court will discuss these issues together in the subsequent section.

### B.  Rule 23 Requirements

The PSLRA also requires that the lead plaintiffs satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure, which provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). At this stage, all movants for appointment as lead plaintiff have sufficiently demonstrated the numerosity requirement. Likewise, the commonality requirement has been satisfied because all the movants share common questions of both law and fact.

The lead plaintiff "must make at least a preliminary showing that it has claims that are typical to the putative class and has the capacity to provide adequate representation for those class members." Enron Corp. Sec. Litig., 206 F.R.D. at 441 (citations omitted). However, "[a] proposed class representative is not adequate or typical if it is subject to a unique defense that threatens to play a major role in the litigation." In re Milk Prods. Antitrust Litig.,195 F.3d 430, 437 (8th Cir. 1999) (citations omitted); see also In re Safeguard Scientifics, 216 F.R.D. 577, 581-82 (E.D. Pa. 2003) (citations omitted). Typicality assesses "whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class

11

members so as to assure that the absentees' interests will be fairly represented." Safeguard Scientifics, 216 F.R.D. at 581. "Adequate representation requires a finding that the purported class representative and its attorney are capable of pursuing the litigation and that neither has a conflict of interest with other class members." In re Cree, Inc. Sec. Litig., 219 F.R.D. 369, 372 (M.D. N.C. 2003) (citing Sosna v. Iowa, 419 U.S. 393, 403 (1975)).

As noted earlier, San Antonio sold all of its shares by September 10, 2004, and owned no shares on August 9, 2005. It explains that it liquidated its position "after numerous disclosures that partially revealed the Company's true condition and caused AIPC shares to decline." Doc. # 53 at 4 (emphasis deleted). San Antonio's effort to equate these events with revelations of fraud is not entirely correct. The disclosures are summarized below:[3]

1. After the market closed on April 12, 2004, AIPC lowered guidance for the second quarter of 2004. The next day, AIPC shares closed 3% lower than they had the day before.

2. After the market closed on April 28, 2004, AIPC announced the second quarter results for 2004 in-line with the revised guidance from April 12. The next day, AIPC shares closed 4.7% lower than they had the day before.

3. During the day on June 23, 2004, AIPC announced it was suspending or limiting operations at various plants. The closing price on June 23 was higher than the preceding day's price, although June 24's close was 3.8% lower than the closing price on June 23.

4. After the market closed on July 28, 2004, AIPC announced a loss for the third quarter. The closing price on July 29 was higher than the closing price on July 28.

---

[3]The "U.S. Public Pension Funds" identify additional alleged "partial disclosures" but they occurred after San Antonio divested its position in AIPC.

12

These one-day changes are far less significant than the 33.5% drop in stock price immediately following the August 9, 2005 disclosures. In addition to substantiating August 9 as the date the market received curative information, this substantial drop in price suggests the market had not received any curative information prior to that date. At best, the market received information about peripheral events caused by or indicating the fraud, but these events were equally suggestive of normal business events. The market did not receive information about the existence or extent of the fraud itself. Cf. In re McKesson HBOC, Inc. Sec. Litig., 97 F. Supp. 2d 993, 997-98 (N.D. Cal. 1999).

This issue is relevant to the present inquiry because it creates a significant question about San Antonio's damages. "[I]f, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." Dura Pharm., Inc. v. Broudo, 124 S. Ct. 1627, 1631 (2005). In other words, a party selling before the market learns the truth ordinarily has not suffered damages because any losses are unrelated to the correction in stock price arising from revelation of the fraud.[4] Consequently, (1) the measure of damages is ordinarily based on the value of the stock at the time full corrective information has been disseminated and (2) a party who sold before the correction has a difficult task in establishing damages.

This does not mean there cannot be signs of fraud revealed to the market before the entire truth is revealed, thereby opening the possibility of damages for a party who sells before full disclosure is made to the market. However, such a case requires a heavily fact-intensive inquiry that is not appropriately undertaken at this preliminary stage of the proceedings. It must be determined whether and to what extent the losses were caused by the "leaks of fraud" as opposed to normal market and business activity. San Antonio may have suffered damages (an issue the Court need not and does not decide

---

[4]On the other hand, a sale significantly after the market learns the truth presents a different problem: the "lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." Id. at 1632.

13

at this juncture), but the existence and extent of those damages is uncertain and it is unnecessary and inappropriate to delay proceedings to ascertain the precise extent of its loss so it may be compared to those who held their stock on the day of the correction. Cf McKesson, 97 F. Supp. 2d at 998. Additionally, the entire issue represents a "unique defense" that renders San Antonio ill-suited for service as a class representative.

The party with the next-highest amount in losses is the Iron Workers. The Court discerns no basis for disqualifying them or for bypassing them in favor of any of the other applicants. Accordingly, the Court appoints the Iron Workers as Lead Plaintiff in this action.

### III. APPROVAL OF CLASS COUNSEL

Pursuant to PSLRA, once the most adequate plaintiffs are selected, the "most adequate plaintiff[s] shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v). Lead Plaintiffs seek approval of their selection of the law firm of Pomerantz Haudick Block Grossman & Gross LLP ("Pomerantz Haudick") to serve as Lead Counsel. Upon review of the firm résumé, it appears Pomerant Haudick has significant experience (and has been extremely effective) litigating securities class actions, employs several highly qualified attorneys, and possesses ample resources to effectively manage the class litigation and protect the class's interests. Thus, Pomerantz Haudick is appointed as Lead Counsel for the Plaintiff Class.

Lead Plaintiff also requests the Court approve Kent T. Perry & Co., LC ("Kent Perry") to serve as local counsel. Lead Plaintiffs are free to choose whomever they wish to represent them locally. Therefore, this request is denied as moot.

## IV. PROCEEDINGS FROM THIS POINT

Within thirty days, Lead Plaintiff shall file an Amended Complaint. In preparing the Amended Complaint, Lead Counsel should obviously consider claims that have been asserted in all the cases that have been consolidated into this proceeding. All defendants named in the Amended Complaint shall have thirty days to file an Answer or Amended Answer as the case may be. Once these tasks are completed, the Court will issue an order establishing Rule 26 deadlines and requirements.

Counsel are reminded that the undersigned prefers to receive courtesy copies of all operative pleadings, dispositive motions, and pleadings exceeding ten pages in length. In addition, for a variety of technical reasons the Court shall not belabor at this time, Lead Counsel is strongly encouraged to utilize the Adobe Acrobat software necessary to convert filings to Portable Document Format, or *.pdf.

## V. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED:

(A) In Stengle v. American Italian Pasta Co., Case No. 05-0725:
  1. The motions to consolidate (Docs. # 18, 22 and 34) are GRANTED;
  2. Iron Workers' Motion to Appoint Lead Counsel (Doc. # 25) is GRANTED;
  3. The "U.S. Public Pension Funds'" motion to appoint lead counsel (Doc. # 31) is DENIED;
  4. The motions to withdraw filed by IBEW Local No. 98 Pension Fund and Thomas Mayer and the Hummer Growth Fund (Docs. # 47 and 45, respectively) are GRANTED, and their motions to be appointed lead plaintiff and for approval of lead counsel (Docs. # 22 and 36, respectively) are DENIED.

(B) In Brody v. American Italian Pasta Co., Case No. 05-0730:
  1. The motions to consolidate (Docs. # 18 and 22) are GRANTED;

15

2. The motion to appoint lead counsel (Doc. # 27) is DENIED;

3. IBEW Local No. 98 Pension Fund's motion to withdraw (Doc. # 30) is GRANTED.

(C) In Clark v. American Italian Pasta Co., Case No. 05-0769:

1. The motions to consolidate (Docs. # 17 and 21) are GRANTED;

2. The motion to appoint lead counsel (Doc. # 26) is DENIED;

3. IBEW Local No. 98 Pension Fund's motion to withdraw (Doc. # 29) is GRANTED.

(D) In Rothstein v. Webster, Case No. 05-0909:

1. The motions to consolidate (Docs. # 25 and 27) are GRANTED;

2. The motion to consolidate and for appointment of lead plaintiff and lead counsel (Doc. # 37) is GRANTED IN PART and DENIED IN PART;

3. The motions for extension of time (Docs. # 34 and 41) are DENIED AS MOOT in light of the Court's Order.

(E) In Fasth v. Webster, Case No. 05-0928:

1. The motion to consolidate and for appointment of lead plaintiff and lead counsel (Doc. # 9) is GRANTED IN PART and DENIED IN PART;

2. The motions for extension of time (Docs. # 8, 20 and 22) are DENIED AS MOOT in light of the Court's Order.

(F) In Corallo v. Webster, Case No. 05-0996:

1. The motion to consolidate and for appointment of lead plaintiff and lead counsel (Doc. # 7) is GRANTED IN PART and DENIED IN PART;

2. The motions for extension of time (Docs. # 15 and 17) are DENIED AS MOOT in light of the Court's Order.

(G) In <u>Firefighers' Pension Fund of the City of Kansas City, Missouri v. Patterson</u>, Case No. 05-1139, the motion for extension of time (Doc. # 20) is DENIED AS MOOT in light of the Court's Order.

IT IS SO ORDERED.

                                    /s/ <u>Ortrie D. Smith</u>
                                    ORTRIE D. SMITH, JUDGE
DATE: December 19, 2005          UNITED STATES DISTRICT COURT