IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

IN RE: AMERICAN ITALIAN PASTA            )
COMPANY SECURITIES LITIGATION.   )   Case No. 05-0725-CV-W-ODS
                                         )

ORDER AND OPINION GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTIONS TO DISMISS

On January 19, 2006, Plaintiffs filed an Amended Complaint asserting (1) claims of securities fraud on behalf of a class of shareholders of American Italian Pasta Company ("AIPC") and (2) "derivative claims" on behalf of AIPC against certain officers, directors and other individuals. Various motions to dismiss have been filed; as discussed more fully below, the motions are granted in part and denied in part. All derivative claims and all claims against David Potter are dismissed.

I. STANDARD

A motion to dismiss for failure to state a claim should be granted when it appears that "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Davis v. Hall, 992 F.2d 151, 152 (8th Cir. 1993) (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). In ruling on a motion to dismiss, the Court is required to view the facts alleged in the complaint in the light most favorable to the plaintiff. The Court is limited to a review of the Complaint; the only items outside the Complaint that may be considered without converting the motion to one seeking relief pursuant to Rule 56 of the Federal Rules of Civil Procedure are (1) exhibits attached to the Complaint, and (2) materials necessarily embraced by the Complaint. Mattes v. ABC Plastics, Inc., 323 F.3d 695, 698 (8th Cir. 2003). The parties have also invited the Court to take judicial notice of certain documents, but the Court did not find any of them to be relevant to the contested issues.

With respect to the securities fraud claims, the Private Securities Litigation Reform Act of 1995 ("PSLRA") "dictates a modified analysis due to its special heightened pleading rules." Kushner v. Beverly Enter., Inc., 317 F.3d 820, 824 (8th Cir. 2003). The

purpose of the heightened pleading standard was set forth to eliminate abusive securities litigation and put an end to the practice of pleading "fraud by hindsight." In re Vantive Corp. Secs. Litig., 283 F.3d 1079, 1084-85 (9th Cir. 2002). The PSLRA requires plaintiffs "to specify each misleading statement or omission and specify why the statement or omission was misleading." Id. at 326 (citing 15 U.S.C. § 78u-4(b)(1)). The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); see also Kushner, 317 F.3d at 826 (citation omitted). Finally, the Court must "disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements." Id. at 824 (quoting Florida State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 660 (8th Cir. 2001)).

## II. SECURITIES FRAUD CLAIMS – INDIVIDUALS

Generally speaking, the Amended Complaint alleges between January 23, 2002 and August 17, 2005 (the "class period"), AIPC (including some of its officers and other officials) purposely engaged in various actions designed to create a facade of favorable financial results, then publicly reported the facade instead of the underlying, less favorable reality. When the real situation came to light, AIPC's stock price plummeted to the detriment of those who purchased stock while the chicanery was taking place. Collectively, the combined effect of these actions has caused AIPC to publicly declare that its financial statements for fiscal years 2002, 2003, 2004 and the first two quarters of 2005 should not be relied upon and will need to be restated. Amended Complaint, ¶¶ 12, 211. Needless to say, this announcement had a profound effect on AIPC's stock price. E.g., Amended Complaint, ¶¶ 10, 215. The improper actions are categorized as follows:

*Improper Capitalization of Operating Expenses*

Proper accounting practice calls for certain costs to be identified as expenses in the period in which they are incurred. Some exceptions – particularly those related to acquisition of real estate or construction projects – may be capitalized, which allows their financial impact to be felt over a period of time. AIPC is alleged to have purposely mis-classified certain expenses as capital expenditures instead of declaring them as expenses when paid. Amended Complaint, ¶¶ 55-56, 58-60.

*Licenses/Brand Names*

AIPC is alleged to have "overpaid" for the rights to manufacture certain brand names of pasta. For instance, Plaintiffs claim "that, in its zeal to be the 'number one low cost producer,' AIPC had built up a significant amount of excess Golden Grain pasta . . . which, if not purchased by Pepsico or its distributors," would amount to a total loss. Amended Complaint, ¶ 65. Therefore, in order to maintain its ability to sell pasta under Pepsico's brand, AIPC paid much more than the license was worth. Amended Complaint, ¶ 64.

The overproduction and overpayment provide background to the actual fraud alleged. The value of a food license is based on the capitalized value of the royalties the licensee would pay. However, AIPC is alleged to have listed the licenses as an asset with a value based on the amount paid for them (which dramatically overstated their value) and refrained from writing down their value. Amended Complaint, ¶¶ 67-72. In August 2005, a $35 million charge was taken to rectify the failure to take charges during the relevant time period. Amended Complaint, ¶ 74.

*Timing of Revenue Recognition*

Plaintiffs allege a myriad of manners in which revenue was improperly or prematurely recognized, thereby making it appear AIPC's revenues were greater than

they really were. Examples include booking sales on product that had not been shipped and purposely shipping more product than the customer ordered. Amended Complaint, ¶¶ 76-77.

*Accounting for Excess and Unsold Inventory*

Plaintiffs allege excess inventory built up, primarily due to (1) a decline in demand for pasta products and (2) AIPC's policy of operating plants at full capacity regardless of demand in order to minimize its per-unit manufacturing costs. Amended Complaint, ¶ 81. AIPC allegedly contrived various means of "hiding" the excess inventory to avoid taking a write-off; these contrivances are detailed in paragraph 82 of the Amended Complaint. The inventory appeared on the company's balance sheet at its full value even though the methods of storage rendered the product unusable, creating the appearance that AIPC's assets were greater than they really were and avoiding the charge for unusable inventory that would have altered AIPC's financial data. Amended Complaint, ¶¶ 82-86.

*Improper Accrual of Product Promotion Allowances*

AIPC attempted to increase consumer demand for pasta by initiating promotions (such as "two for one" offers). By prior arrangement, AIPC agreed to reimburse the retailers for their advertising costs. These costs were deducted by the retailer from the invoices due to AIPC; in other words, AIPC billed the retailer for the full cost of the product, and the retailer would deduct the reimbursement due under the promotion before paying the invoice. Amended Complaint, ¶¶ 89-90.

Generally Accepted Accounting Principles ("GAAP") required AIPC to recognize the cost of the promotional allowances at the same time it booked the revenue from the sale to the retailer. Amended Complaint, ¶ 92. This was not done; instead, the full amount of the invoice revenue would be booked and the promotional costs would be delayed, presenting a distorted and inflated impression of AIPC's costs and net

4

revenues. Amended Complaint, ¶¶ 93-96. The under-accrued promotion allowances swelled to over $8.7 million by July 2003 (or, 2/3 of AIPC's quarterly income); when this figure came to light, the sum was reclassified as a receivable due from customers to avoid the need to take the charge all at once. Amended Complaint, ¶ 96.

### A. Falsity/Materiality

Defendants contend Plaintiffs have failed to identify the false statements with sufficient particularity. The Court disagrees. The Amended Complaint identifies a course of action taken for the express purposes of hiding true facts, altering data, and otherwise creating a false basis for positive financial reports – and the distorted financial reports were then publicized, while the reality was purposely hidden from view of the public and investors. Plaintiffs have identified these efforts with particularity and have included sources of information and, in most cases, the dollar-impact on AIPC's financial statements. This is not a case of "fraud by hindsight" or simple failure to anticipate changing business conditions: Plaintiffs essentially contend Defendants purposely fabricated AIPC's balance sheets, income statements, and other financial information.

Defendants' contentions regarding the materiality of the information require little discussion. Financial information is routinely relied upon by investors in making their investment decisions, so the relevance of these misstatements is not subject to serious doubt. E.g., Parnes v. Gateway 2000, 122 F.3d 539, 546 (8th cir. 1997). The Amended Complaint adequately "indicate[s] why the alleged misstatements would have been false or misleading at the several points in time in which it is alleged they were made." In re Cerner Corp. Sec. Litig., 425 F.3d 1079, 1083 (8th Cir. 2005).

It remains to be seen whether Plaintiffs can prove their allegations; however, this is not the time to test the truth of the allegations.

## B. Scienter/Relationship Between Individuals and the Alleged Fraud

The individual defendants present a series of related arguments, some contending Plaintiffs have not satisfied the heightened pleading requirements with respect to the scienter element and others contending Plaintiffs have not adequately plead a connection between the individual defendant and the conduct. These arguments will be addressed together.

Obviously, actual knowledge that public statements are false will establish scienter. In addition, scienter may be inferred in appropriate circumstances. "Inferences of scienter must be both reasonable and strong to survive a motion to dismiss." Ferris, Baker Watts, Inc. v. Ernst & Young, LLP, 395 F.3d 851, 854 (8th Cir. 2005). Scienter is not demonstrated by negligent conduct, but it may be demonstrated by recklessness. Recklessness consists of "unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." Green Tree, 270 F.3d at 654 (quotation omitted). Violations of GAAP combined with corresponding evidence of fraudulent intent may be sufficient. Ferris, Baker, 395 F.3d at 855. "Insider trading activity may create an inference of scienter when the trading activity during the class period is unusual" as determined by considering the trading that took place and "any additional allegations – such as prior trading history – that would tend to show [the] trading activity was otherwise unusual." In re Cerner Corp., 425 F.3d at 1085. Finally, "[o]ne of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." Green Tree, 270 F.3d at 665.

All that has been said applies solely to the pleading requirements Plaintiffs must satisfy. The PSLRA provides a basis for challenging the pleading's specificity, but has no role in determining whether the specific allegations are legally sufficient to state a

6

claim. Id. at 653. Evaluating the sufficiency of the specific allegations requires examining the allegations against the individual defendants.

Timothy Webster was AIPC's President, CEO, and a member of the Board of Directors. Amended Complaint, ¶ 24. In early February 2005, he sold over half of his shares in the company; his last previous sale of company stock was in 2001. Amended Complaint, ¶ 24(b).[1] During his tenure, Webster told his subordinates to "do whatever was necessary to make their numbers." Amended Complaint, ¶ 52. This included directives that personnel improperly capitalize operating costs. Amended Complaint, ¶ 58. Webster also instructed that manufacturing plants were to operate at full capacity even though the company was producing more pasta than it could sell. Amended Complaint, ¶ 81. Webster's insistence that all steps be taken to meet Wall Street's expectations intensified as AIPC's true financial situation deteriorated. Amended Complaint, ¶ 101(a).

Walter George was Executive Vice President of Operations and Supply Chain since January 2003. Prior to that time he was Senior Vice President of Operations and Supply Chain. Amended Complaint, ¶ 28. George has not filed a Motion to Dismiss (in fact, it does not appear that he has been served), but the allegations against him are worth summarizing here. He allegedly knew about AIPC's practice of capitalizing expenses. Amended Complaint, ¶ 54. George also instructed subordinates to "overship" to customers and include the entire amount shipped as part of the company's revenues and to commence manufacturing before orders were received, leading to increased inventory and the false impression that sales were increasing. Amended Complaint, ¶¶ 76(d), 82(b), 105

David Potter was one of AIPC's Executive Vice-Presidents from an unstated point in time until he left the company in March 2004. During the class period, he sold all of

---

[1] Webster contends he sold the stock to raise money so he could exercise options on AIPC stock, and he ultimately ended up with more stock than he started with. This may be, but the Court will not accept Webster's invitation to weigh the value or effect of this fact. The Court is obligated to construe all inferences in favor of Plaintiff; not even the PSLRA changes this well-accepted aspect of Rule 12(b)(6).

7

his AIPC stock. However, he sold approximately 65% of it approximately one month before leaving the company, and the rest was sold at various times between February 2002 and December 2003. Amended Complaint, ¶ 29.

Jerry Dear was also one of AIPC's Executive Vice-Presidents; he was in charge of Special Channels and Private Labels. During the class period, he sold over 93% of his AIPC stock. Amended Complaint, ¶ 30.

Warren Schmidgall was another Executive Vice President. In addition, he served as the Chief Financial Officer from some time in 2000 until August 2004. Amended Complaint, ¶ 25. Like Webster, Schmidgall issued orders to capitalize expenses that should have been identified as operating costs. Amended Complaint, ¶ 59. He also knew about the improper accounting for promotional allowances and instructed subordinates to improperly identify amounts that should have been deducted from revenue as accounts receivable. Amended Complaint, ¶¶ 95-96, 102(b).

George Shadid became an Executive Vice President and replaced Schmidgall as CFO in August 2004.

Horst Schroeder was Chairman of AIPC's Board until August 2005. Amended Complaint, ¶ 27.

William Patterson was a member of the Board of Directors and Chairman of its Audit Committee. He was a partner at the Arthur Andersen accounting firm. Amended Complaint, ¶ 31. Jonathan Baum and James Heeter were the other members of the Audit Committee. Amended Complaint, ¶¶ 32-33. The Audit Committee met with AIPC's accountants and senior management regularly. Amended Complaint, ¶ 104(b).

Finally, certain general allegations are relevant. As required by the Sarbones-Oxley Act of 2002, Webster, Schmidgall, Shadid, and all three members of the Audit Committee signed declarations certifying they were was familiar with AIPC's controls, books and records and they were therefore able to attest to the accuracy of AIPC's financial statements. Amended Complaint ¶¶ 101(b), 102(a), 104(a), 106, 125. Annual reports filed with the SEC were certified by Schroeder, Webster, Schmidgall, and the members of the Audit Committee. In many instances, the nature of the fraud alleged is of such duration and nature that it is reasonable to infer that members of upper

8

management were aware of it, involved in it, or were so unaware of what was happening they were discharging their duties in a reckless manner.[2]

      This summary of the Amended Complaint's specific allegations demonstrates sufficient grounds for satisfying the scienter element with respect to all Defendants except for Potter. Webster's primary objective was to satisfy Wall Street analysts by meeting or exceeding expectations. He required plants to operate at capacity even though sales did not match AIPC's production, so he had reason to know about the inventory build-up. He issued orders to capitalize expenses, which he knew to be inappropriate. By signing the Sarbones-Oxley certifications and the Annual Reports filed with the SEC, Webster indicated he had reviewed and was familiar with the underlying facts giving rise to those documents – meaning he was either aware of the improper accounting, was reckless with regard to the public reports of AIPC's finances, or had not conducted any review and did not act in accordance with the certifications.[3] Webster also made personal stock transactions that may support an inference of guilty knowledge. Dear was in charge of AIPC's operations regarding private labels, and the nature of the fraudulent valuations of the private label licenses supports a strong inference that Dear was aware of the accounting irregularities in his division. In addition, his sale of stock supports an inference of fraud. Schmidgall knew about the improper accounting for promotional allowances and issued instructions to improperly identify accounts receivable and capitalize expenses. Schmidgall and Shadid signed the

---

[2]Plaintiffs also contend some Defendants promoted the adoption of increased protection for board members and other officials at a time when the fraud was to be revealed, thereby protecting themselves from their own wrongdoing. The Amended Complaint does not clearly describe the timing of these events, so the Court has not considered this factor. Plaintiffs are not precluded from pursuing this (or any other) additional basis for substantiating the elements of their claims.

[3]The Court is not intending to imply those who sign such certifications are strictly liable for misstatements. However, it is a factor that may, in appropriate circumstances, demonstrate the person certifying the pronouncement has merely "rubber stamped the numbers" and thereby acted recklessly.

9

Sarbones-Oxley certifications and the Annual Reports, and Schroeder and the members of the Audit Committee signed the Annual Reports.

Obviously, Plaintiffs have more allegations regarding some defendants as compared to others.  There are also facts that may undercut or refute the allegations (e.g., Webster's aforementioned explanation for selling his stock, Shadid's observation that he was CFO for a relatively short period of time and had a hand in changing AIPC's practices, the Audit Committee's claim its members discovered and revealed the fraud). However, the Court is not weighing evidence and again emphasizes this is not the time to put Plaintiffs to their proof.  The only question is whether what they intend to prove – as outlined in their Amended Complaint and viewed in the light most favorable to them – states a legally cognizable claim.  With respect to the aforementioned Defendants, the Court concludes the Amended Complaint is sufficient.

The Court reaches a different conclusion with respect to Potter.  Plaintiffs do not allege Potter was directly involved in (or even aware of) the accounting irregularities or the facts underlying them.  They do not allege Potter signed the Annual Reports or the Sarbones-Oxley certifications.  The Amended Complaint identifies Potter as an Executive Vice President, but in contrast to the allegations about Dear the Amended Complaint does not indicate what divisions (if any) Potter was responsible for overseeing.  The only basis Plaintiffs offer for inferring Potter's fraudulent intent involves his stock sales, but the facts alleged do not support a particularly strong inference. Potter sold all of his stock during the Class Period, but he made occasional sales throughout that period, and sold the last 65% of his holdings shortly before he left the company.  The circumstances, combined with the lack of any allegations connecting him to the fraudulent activity, deprives this sole allegation of any value.  The Court concludes Plaintiffs' allegations do not satisfy the legal standard for demonstrating Potter's fraudulent intent.[4]

---

[4] The Court rejects Plaintiffs' reliance on the "group pleading" doctrine for several reasons.  Some circuits have applied this doctrine when the allegedly fraudulent statements are contained in annual reports or other communications that are attributed to a group of people instead of a particular individual.  In such a case, liability may be

10

## III. SECURITIES FRAUD CLAIMS – ERNST & YOUNG

Plaintiffs have also asserted securities fraud claims against AIPC's outside auditor and accounting service provider, Ernst & Young, LLP ("E&Y"). E&Y attempts to characterize Plaintiffs' claims as asserting (at worst) improper auditing and accounting procedures amounting to negligence. Such allegations, without more, are insufficient to establish fraud. "Allegations of GAAP violations are insufficient, standing alone, to raise an inference of scienter." Ferris, Baker, 395 F.3d at 855. In contrast, GAAP violations are sufficient if the "defendant published statements knowing that crucial information in them was based on discredited assumptions." Id. (citing Green Tree, 270 F.3d at 665).

Plaintiffs allege E&Y received more than twenty-five anonymous letters between September 2002 and January 2005, detailing the improprieties described earlier in this Order. Amended Complaint, ¶ 5; see also Amended Complaint, ¶¶ 57, 73, 80, 87, 97. E&Y ignored these letters, failing even to investigate the claims they asserted or mention them to the Auditing Committee. Amended Complaint, ¶¶ 250(a)-(k), 252. "One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." Green Tree, 270 F.3d at 665. The Amended Complaint specifically alleges E&Y had access to information suggesting the financial reports distributed to the public were false, yet E&Y certified them anyhow. This is sufficient to assert a claim of fraud.

---

imposed on individuals in the group so long as they are actively involved in the company's operations or the transactions in question. E.g., Wool v. Tandem Computers Inc., 818 F.3d 1433, 1440 (9th Cir. 1987); In re Metawave Communications Corp. Sec. Litig, 298 F. Supp. 2d 1056, 1087 (W.D. Wash. 2003); Polar Int'l Brokerage Corp. v. Reeve, 108 F. Supp. 2d 225, 238 (S.D.N.Y. 2000). However, Plaintiffs have not identified any authority indicating the Eighth Circuit has (1) adopted this doctrine or (2) determined it survives the PSLRA. Most importantly, Plaintiffs have not alleged sufficient facts suggesting Potter should be included in the "group" responsible for disseminating the allegedly fraudulent statements.

11

## IV. DERIVATIVE CLAIMS

Plaintiffs assert a variety of claims ostensibly on behalf of AIPC. These derivative claims are asserted against all of the individuals mentioned previously, as well as the other individuals who served on the Board of Directors at various times during the Class Period (Robert Niehaus, Terence O'Brien, Tim Pollak, Mark Demetree, Richard Thompson, and John O'Brien).[5] Plaintiffs allege the "derivative defendants" are liable to AIPC for violations of fiduciary duties, gross mismanagement, misrepresentation and manipulation of financial reports, misrepresentation regarding and failure to establish internal accounting controls, exposing AIPC to liability for securities fraud violations, and awarding and receiving bonuses based on the bogus "positive results" manufactured for the company. A claim of malpractice is also asserted against E&Y. For relief, the derivative claims seek to recover the damages suffered by AIPC as a result of the fraud (i.e., damages that it must pay to shareholders, fines, investigation costs), the value of all personal stock sold by Defendants at a profit while the stock price was artificially/fraudulently inflated, and recovery of bonuses paid.

Defendants present two principal arguments: (1) the derivative claims are barred by federal law and (2) Plaintiffs have not alleged a sufficient basis for failing to demand AIPC's Board of Directors take action. The Court agrees with the latter point and dismisses the derivative claims on that basis without addressing the federal issue.

"The derivative form of action permits an individual shareholder to bring suit to enforce a corporate cause of action against officers, directors and third parties. . . . [T]he purpose of the derivative action was to place in the hands of the individual shareholders a means to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers." <u>Kamen v. Kemper Fin. Serv., Inc.</u>, 500 U.S. 90, 95 (1991) (quotations omitted). Rule 23.1 of the Federal Rules of Civil Procedure require a would-be derivative plaintiff to "allege with particularity the efforts, if

---

[5]The other board members were Webster, Schroeder, Baum, Patterson, and Heeter.

12

any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority . . . and the reasons for the plaintiff's failure to obtain the action or for not making the effort."  The rule does not create an obligation to make such a demand, but merely establishes pleading requirements: the obligation to make a demand and the grounds for excusing a demand are provided by the state of incorporation. Kamen, 500 U.S. at 96-97.  AIPC was incorporated in Delaware.  Plaintiffs concede Delaware law requires shareholders to either demand action from a corporation's board or demonstrate that such a demand would be futile.  Plaintiffs admit they have not made a demand, but contend the Amended Complaint sufficiently alleges a demand would be futile as that concept is applied under Delaware law.

Delaware law requires a demand be made upon the board as constituted at the time the complaint is filed.  E.g., Pogostin v. Rice, 480 A.2d 619, 624 (Del. 1984), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000).  The requirement insures the stockholder has pursued the remedies he or she has within the corporate structure, prevents vindictive or "strike" suits, and provides the corporation with an "'opportunity to address an alleged wrong without litigation, to decided whether to invest the resources of the corporation in litigation, and to control any litigation which does occur.'"  Blasband v. Rales, 971 F.2d 1034, 1048 (3d Cir. 1992) (quoting Spiegal v. Buntrock, 571 A.2d 767, 773 (Del. 1990)).  Delaware has adopted a two-prong test to determine whether these interests are overcome in a particular case, thereby excusing the need for the shareholder to make a demand on the corporation's board:

> In determining the sufficiency of a complaint to withstand demand futility, the controlling legal standard is well established.  The trial court is confronted with two related but distinct questions:  (1) whether threshold presumptions of director disinterest or independence are rebutted by well-pleaded facts;  and, if not, (2) whether the complaint pleads particularized facts sufficient to create a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment.

Levine v. Smith, 591 A.2d 194, 205 (Del. 1991).

13

Plaintiffs posit a different, albeit similar test; one that requires the Court to ascertain "whether or not the [Complaint] create[s] a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." Rales v. Blasband, 634 A.2d 927, 934 (Del. 1993). However, this variant applies only if the board upon which the demand is being made is different from the board that made the challenged decision (e.g., when a majority of the directors have been replaced, where the basis for the suit is not a business decision of the board, or a different corporation's board is in control at the time of the suit). Id. at 933-34. Plaintiffs have repeatedly emphasized that the members of the board when the Amended Complaint was filed were also on the board when the transactions at issue took place, so Rales' variation does not apply. In any event, Plaintiffs' arguments mirror those that would be made under Levine's first prong.[6]

"Directorial interest exists whenever divided loyalties are present, or where the director stands to receive a personal financial benefit from the transaction not equally shared by the shareholders." Blasband, 971 F.2d at 1048. Plaintiffs argue there is reason to doubt a majority of AIPC's board is disinterested, and principally rely upon the threat of personal liability faced by the directors. In this case, these allegations are insufficient. "A plaintiff may not bootstrap allegations of futility merely by pleading that the directors participated in the challenged transaction or that they would be reluctant to sue themselves." Id. at 1049. However, "in rare cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." Aronson v. Lewis, 473 A.2d 805, 815 (Del. 1984), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000).

---

[6]The Court discerns no real difference between the two standards. The true effect of Rales is to remove the second prong from Levine, and creates a standard for "different board cases" that is very similar to the first prong from Levine.

14

Complicating the analysis is a lack of clarity over who was on the board at various times. This is important because a demand is to be made on the board at the time the derivative complaint is filed, and subsequent changes to the board do not "cancel" a finding of futility once it is made. In attempting to demonstrate futility, Plaintiffs appear to be focusing on the board as it existed when the first derivative complaint was filed prior to the consolidation of cases against AIPC. This appears to be inappropriate: no futility was found at that time, and the strong interests favoring normal corporate governance counsel against analyzing futility based on the board's composition prior to the filing of the complaint spawning the futility analysis. Therefore, the proper analysis would focus on the board's composition at the time the Amended Complaint was filed.

Ultimately, it does not matter because Plaintiffs' arguments favoring futility fall flat with regard to almost all of the eleven board members they have identified. Six members are not alleged to be liable at all.[7] Of the five who face liability, the Court cannot conclude Schroeder, Patterson, Baum and Heeter face a "substantial" likelihood of liability. To hold otherwise would eliminate the cautions that such a basis for futility be "rare" and that plaintiffs cannot "bootstrap" a claim of futility onto claims of wrongdoing or liability on the part of the directors. In addition, the futility exception itself is to be applied sparingly, so merely suing a director individually is not enough to demonstrate a lack of independence.

Plaintiffs also contend that business and personal relationships between the board members would preclude them from taking action against each other. However, these relationships are not atypical in the world of corporate governance, and to place much weight on this contention would allow futility to become the norm instead of the

---

[7]In a footnote, Plaintiffs contend that, "[a]lthough not alleged in the Complaint," the six directors not named as defendants on the securities law claims face liability because they also signed various SEC filings. These allegations are not included in the Amended Complaint as required by Rule 23.1, so the Court is precluded from considering these assertions. Plaintiffs observe they can add these allegations to a Second Amended Complaint, but the composition of AIPC's board has changed, and Plaintiffs would need to make a demand (or demonstrate the futility of demand) on the directors at the time any Second Amended Complaint is filed.

15

exception. Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 845 A.2d 1040, 1050-51 (Del. 2004).

The Amended Complaint's allegations do not demonstrate a demand on the board, as constituted at the time it was filed, would have been futile. The obligation to demand the board take action is not excused by Plaintiffs' allegations of futility, so the derivative claims must be dismissed.

## IV. CONCLUSION

All claims against David Potter are dismissed. All derivative claims are dismissed, which also results in the dismissal of all claims against Robert Neihaus, Terence O'Brien, Tim Pollak, Mark Demetree, Richard Thompson, and John O'Brien.

IT IS SO ORDERED.

DATE: June 19, 2006

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
UNITED STATES DISTRICT COURT

16