IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

IN RE: AMERICAN ITALIAN PASTA )
COMPANY SECURITIES LITIGATION. )   Case No. 05-0725-CV-W-ODS
                                )

ORDER AND OPINION GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Pending is Lead Plaintiff's Motion to Certify Class. For the following reasons, the motion (Doc. # 181) is granted in part and denied in part.

I. BACKGROUND

This case represents the consolidation of several lawsuits brought against Defendants American Italian Pasta Company ("AIPC") and certain of its officers and directors for violations of the Securities Exchange Act. The cases were consolidated on December 19, 2005, at which time the Court also appointed Iron Workers Local # 40, # 361, and # 417 Union Security Funds as the Lead Plaintiff in this matter. An Amended Complaint was filed on January 19, 2006, and some of the claims were dismissed by Order dated June 19, 2006.

Generally speaking, the remaining claims allege between January 23, 2002 and August 17, 2005 (the "class period"), Defendants engaged in various actions designed to create a facade of favorable financial results, then publicly reported the facade instead of the underlying, less favorable reality. When the real situation came to light, AIPC's stock price plummeted to the detriment of those who purchased stock while the chicanery was taking place. AIPC has publicly declared its financial statements for fiscal years 2002, 2003, 2004 and the first two quarters of 2005 should not be relied upon and will need to be restated. Amended Complaint, ¶¶ 12, 211. Needless to say, this announcement also had a profound effect on AIPC's stock price. E.g., Amended Complaint, ¶¶ 10, 215.

Lead Plaintiff (sometimes referred to as "Plaintiff") now seeks certification of a class of similarly situated investors, which it defines as

> All purchasers of the common stock or call options, and sellers of put options of American Italian Pasta Company during the period from January 23, 2002, through August 17, 2005, inclusive (the "Class Period").

Lead Plaintiff also proposes the Court appoint two class representatives: Lead Plaintiff and George Clarke. All Defendants have either filed oppositions or joined in oppositions filed by other Defendants. Some of Defendants' arguments have merit, but those that do can be alleviated by modifying the class definition Lead Plaintiff has proposed.

## II. DISCUSSION

Federal Rules of Civil Procedure 23(a) requires the moving party, as a prerequisite applicable to all class actions, to show: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims of defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. In addition to meeting the prerequisites of 23(a), the Court must be satisfied that "the questions of law or fact common to the members of the class predominated over any questions affecting only the individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. 23(b)(3).

### A. Rule 23(a)'s Requirements

*1. Numerosity*

Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impracticable." Plaintiff bears the burden of establishing that numerosity

2

exists. Belles v. Schweiker, 720 F. 2d 509, 515 (8th Cir. 1983). Plaintiff observes AIPC common stock was traded on the New York Stock Exchange ("NYSE") and estimates "millions" of shares traded during the Class Period. The precise number of class members is not presently known, but Plaintiff estimates the number to be in the "hundreds if not thousands" who are all geographically dispersed. Significantly, none of the Defendants present any arguments disputing a properly-defined class will satisfy the numerosity requirement. The Court finds this requirement has been satisfied.

## *2. Commonality & Typicality*

Although they are separate requirements, commonality and typicality "tend to merge" and are often discussed together. General Tele. Co. of the Southwest v. Falcon, 457 U.S. 147, 157 n.13 (1982). Commonality exists when the "legal question linking the class members is substantially related to the resolution of the litigation." DeBoer v. Mellon Mortgage Co., 64 F.3d 1171, 1174 (8th Cir. 1995). Commonality "does not require that every question of law or fact be common to every member of the class, and may be satisfied, for example, 'where the question of law linking the class members is substantially related to the resolution of the litigation even though the individuals are not identically situated.'" Paxton v. Union Nat'l Bank, 688 F.2d 552, 561 (8th Cir. 1982), cert. denied, 460 U.S. 1083 (1983) (quoting American Finance Sys., Inc. v. Harlow, 65 F.R.D. 94, 107 (D. Md. 1974) (other internal citations omitted)). Typicality means the plaintiff has the same or similar grievances as the members of the class who have the same or similar grievances as the plaintiff. Alpern v. UtiliCorp United, Inc., 84 F. 3d 1525, 1540 (8th Cir. 1996). The burden of demonstrating typicality is fairly easy to meet so long as other class members have claims similar to the named plaintiff. DeBoer, 64 F. 3d at 1174. "Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." Alpern, 84 F.3d at 1540.

3

Common and typical issues abound, including (1) the existence and content of misrepresentations and omissions, (2) the materiality of those misrepresentations and omissions, (3) the effect of those representations and omissions on AIPC's stock price, and (4) the presence or absence of scienter on the part of the individual defendants. Many individual issues that might otherwise exist are absent because Plaintiff is proceeding on a "fraud on the market" theory, which obviates the need to show individual reliance (or awareness) of any particular fraudulent statement or omission. Basic, Inc. v. Levinson, 485 U.S. 224, 245-47 (1988).

Defendants contend Lead Plaintiff is not similarly situated to the rest of the class based on its investment strategy. Coleman Brandt is the individual entrusted to make Lead Plaintiff's investment decisions, and he explained that he utilized a variety of mathematical formula that considered matters such as earnings, cash flow, and book value in an attempt to identify stocks that were undervalued by the market. In this manner, Brandt hopes to identify stocks possessing a market price below its value. The Court does not understand how this investing view is inconsistent with the commonality and typicality requirements; indeed, this is a popular investing strategy referred to as "value investing" that has been espoused for many years by many investors, including most notably Warren Buffett. Timothy Vick, How to Pick Stocks Like Warren Buffet 55-58 (2001). Using financial information, the investor attempts to identify stocks that the market dislikes or has unjustified concerns about in order to purchase them at a price lower than their actual value. In this case, Brandt explained the market seemed to view the low-carb diet craze as a negative factor on AIPC's business, which caused downward pressure on AIPC's stock price. However, Brandt's financial analysis – based on the allegedly false data supplied by Defendants – suggested the effect of low-carb diets had less impact on AIPC's business than was reflected in the stock price. This made AIPC's stock price lower than its true value – assuming, of course, the underlying fundamentals and data supplied by Defendants were accurate.[1] The actual

---

[1]Notably, the fraud on the market theory neither assumes nor requires the market to correctly value a stock's price; it only requires the market's pricing decision be based on true and accurate information. E.g., In re Xcelera.com Securities Litig., 430 F.3d

use of financial data by Lead Plaintiff will not expose it to unique defenses and have no bearing on the commonality/typicality analysis.

Defendants also contend the class definition is overly broad and will include individuals who lack commonality with others. This encompasses two categories of investors. First, Defendants contend the class definition will include investors who sold their stock before the alleged misrepresentations were corrected, thereby impacting (if not denying) their ability to demonstrate damages in the same manner as an investor who held their stock until the market fully absorbed the impact of Defendants' corrective statements. Second, Defendants contend the class definition will include investors who bought their stock before any allegedly false statements were made; thus, even under a fraud on the market theory, these individuals are in a different position because they bought stock before the market was supplied with false information.

The Supreme Court has held a plaintiff cannot prevail if all they do is establish the price on the date of purchase was inflated due to fraudulent conduct. When the fraud on the market theory is employed, "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss." Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 342 (2005). No loss is incurred at the moment of purchase; loss is incurred only upon the sale of the security. Thus, if an investor purchases stock before the fraud occurs and sells after the fraud occurs (but before the truth is revealed), the investor cannot have been harmed by the fraud. Similarly, if an investor buys *and* sells the stock after the fraud occurs and before the truth is revealed, any fluctuation in the stock price cannot be attributed to the fraud. Id. at 342-43; Glaser v. Enzo Biochem, Inc., 464 F.3d 474, 478-79 (4th Cir. 2006), petition for cert. filed, 75 U.S.L.W. 3398 (Jan 16, 2007) (No. 06-987). Thus, people who purchased before the first fraudulent statement or sold before curative information was delivered present issues that are not common to the rest of the class.

This is not fatal to certification of the class, however; the problem can be resolved by altering the class definition. Plaintiff contends the class definition should be

---

503, 510 (1st Cir. 2005).

amended to say the members of the class had to "suffer damage" from the fraud. The Court rejects this course because it is too subjective, and does not effectively allow anyone to know exactly who is or should be in the class. This will impact investors, who are not certain whether they are in the class. It will also impact Defendants, who will not be able to determine who is bound by the res judicata effect of any judgment that may be issued. The Court instead elects to limit the class to those who (1) purchased AIPC stock after the first fraudulent statement and also (2) held AIPC stock when curative information was delivered to the market.[2]

Defendants also contend the class definition is overly broad based on the closing date of August 17, 2005. The issue was discussed in the Court's December 19, 2005, Order, and the legal standard employed at that time is replicated below:

> In determining the termination of the class period, the court believes that the appropriate test is that "liability under the securities acts is terminated when curative information is publicly announced or otherwise effectively disseminated." In essence, that test is a preliminary merits determination whether the facts which underlie the gravamen of the plaintiff's complaint continue to represent a reasonable basis on which an individual purchaser or the market would rely.

In re Data Access Sys. Sec. Litig., 103 F.R.D. 130, 143 (D. N.J.,1984) (quoting McFarland v. Memorex Corp., 96 F.R.D. 357, 364 (N.D. Cal. 1982)). In applying this

---

[2]This definition necessarily excludes investors who purchased before the first fraudulent statement and continued to hold the stock when the market received curative information. In one sense, these investors were not damaged by the fraud; they experienced the full brunt of AIPC's deteriorating business situation, which served as the sole cause of their loss. On the other hand, they could contend they would have sold their stock at some point prior to the final collapse and thereby minimized their losses, arguing essentially the fraud on the market caused them to hold their stock instead of minimizing their losses. Regardless of the merits of either view, these investors are in a distinctly different situation than the majority of the class, and their claims to damages depend on too many individual factors to allow their inclusion in this class. In short, those who were lulled into complacency and refrained from selling because of the fraud are not included in this class.

6

Case 4:05-cv-00725-ODS   Document 260   Filed 03/26/07   Page 6 of 12

standard and concluding August 9, 2005, was the closing date for the class, the Court noted the following events:

> After the market closed on that day, AIPC announced (1) a $60.7 million charge, (2) the commencement of an SEC inquiry into accounting improprieties and suspicious stock transactions in late 2004 and 2005, (3) a delay in issuing financial results for the quarter ending July 1, 2005, and (4) a delay in filing its third quarter 10-Q with the SEC. The next day, AIPC's stock price closed $7.15 lower, a drop of approximately 33.5%.

Plaintiff describes these events as a partial disclosure that did not completely cure the prior fraud. Plaintiff suggests full disclosure occurred on August 17, when the Associated Press ran an article entitled "The Accountants Were MIA But the Lawyers Were Hard at Work" that reported Horst Schroeder was terminated as Chairman of the Board and announcing "[i]t becomes very clear that the board and executive officers have been preparing for a train wreck for some time." The stock price fell 6% after the article ran.

The Court believes the August 17 article reiterated and reinforced the August 9 announcement, but did not provide any new information to the market or investors. Certainly, investors (and the market) knew on August 9 that financial information previously disseminated by Defendants was suspect and should not be relied upon. Even if the price dropped after the article was published, the date of "full correction" need not coincide with the stock price's absolute nadir. Therefore, the closing date for the class is August 9, 2005.[3]

Finally, Defendant Schroder argues the class definition is inappropriate with respect to him because the claims against him are different than the claims against the other Defendants. He contends the first public statement attributed to him was made on April 24, 2002 – a fact he describes as requiring each member of the class to prove

---

[3]Interestingly, in light of the earlier modification to the class definition, this decision inures to the class's benefit. One suspects more investors sold between August 9 and August 17 than those who (1) held AIPC stock beyond August 17 and sold after the Associated Press' article – but utilizing the later date would exclude the former group from the class.

7

reliance on his particular statement. Defendant Ernst & Young makes a similar argument. Both arguments are rejected, as these professed differences are insufficient to destroy the commonality and typicality that is present.

### 3. Fair and Adequate Representation

This factor generally requires "(1) that the plaintiff's attorney is qualified, experienced, and will competently and vigorously prosecute the suit, and (2) that the interest of representative is not antagonistic to or in conflict with other members of the class." Griffin v. Carlin, 755 F. 2d 1516, 1533 (11th Cir. 1995). The adequacy of representation requirement tends to merge with the commonality and typicality criteria of Rule 23(a), "which serve as guideposts for determining whether maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Amchem Products, Inc., v. Windsor, 521 U.S. 591, 626 (1997) (quoting General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 157 (1982)). In appointing Lead Plaintiff and approving the choice of Class Counsel, the Court preliminarily found the present designations to be appropriate, and the Court is not persuaded changes are necessary.

Defendants contend Lead Plaintiff and Class Counsel are both inadequate because of a prior, long-standing relationship in which Class Counsel monitors Lead Plaintiff's investments and advises it of any litigation that may affect them. Defendants further contend Class Counsel is not paid for these services, lending credence to its suspicion that Lead Plaintiff retained Class Counsel without thought. The Court does not share Defendants' concerns. The existence of a prior relationship[4] between Lead

---

[4]In fact, the existence of a prior successful relationship suggests a reasonable basis for Lead Plaintiff's selection of Class Counsel. The PSLRA does not require a prospective lead plaintiff to reconsider the issue of representation anew; it was proper for Lead Plaintiff to rely on Class Counsel's past successes in deciding to utilize those services again in this case.

Plaintiff and Class Counsel is not a problem; in fact, given the extensive investments inherent in the operation of a pension fund, the Court is not surprised Lead Plaintiff has arranged for a law firm to keep it apprised of events (including lawsuits) that might be of interest. Arguably, a pension fund's failure to take steps to be aware of existing or prospective litigation that affects its investments would be an abdication of duty.

Even if Defendants are correct in contending Lead Plaintiff is not obliged to pay Class Counsel, the Court discerns nothing alarming. The Private Securities Litigation Reform Act ("PSLRA") prohibits payment to a lead plaintiff for its services on behalf of the class. 15 U.S.C. § 78u-4(a)(2)(A)(vi). This provision is designed to prevent law firms from paying "bounties" to prospective plaintiffs willing to serve as the named plaintiff in securities class-actions. In representing the class, Class Counsel undoubtedly (and understandably) expects to be paid out of any recovery or settlement that may be had – much like any other attorney who enters a contingent fee agreement. This can hardly be criticized as "bribing" a plaintiff to bring a suit they otherwise would not bring.[5]

Finally, several arguments have been presented regarding the proposal to include George Clark as an additional class representative and to include option buyers and sellers in the class definition. The Court need not address all of these arguments because it finds one of them well-taken. In abiding by the PSLRA and appointing Lead Plaintiff, the Court identified the person or group of persons that had complied with the following requirements:

---

[5]Concerns about "overly-litigious" investors roaming courthouses across the land to look for cases to become involved in are somewhat alleviated by prohibitions on "professional plaintiffs." 15 U.S.C. § 78u-4(a)(3)(B)(vi) ("Except as the court may otherwise permit, consistent with the purposes of this section, a person may be a lead plaintiff . . . in no more than 5 securities class actions brought as plaintiff class actions pursuant to the Federal Rules of Civil Procedure during any 3-year period."). Lead Plaintiff had to decide whether this would be one of the limited number of suits for which it would seek to serve as lead plaintiff.

9

(1) Publish, in a widely circulated national business-oriented publication, a notice advising members of the purported plaintiff class of the pending action;

(2) Has the largest financial interest in the relief sought by the class; and

(3) Otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. §§ 78u-4(a)(3)(A), 78u-4(a)(3)(B)(iii). Thus, while the PSLRA does not change the requirements of Rule 23, it subsumes them. Lead Plaintiff could not have been appointed to represent a class of option traders because it did not trade options; therefore, to include claims of option traders would have necessitated appointment of a co-lead plaintiff. However, no party – including Clark – has been approved as a co-lead plaintiff.

Lead Plaintiff disagrees, contending there is a difference between appointing a class representative and appointing a lead plaintiff, and Clark seeks to be the former and not the latter. The Court disagrees. As the representative for a class of option traders, it would be Clark's role – and not Lead Plaintiff's – to act for the class, make decisions for the class, and be responsible for the class's interests. For instance, it would be inappropriate for Lead Plaintiff to decide whether to settle claims of an "options class" when it is not even a member of that class. In substance, then, Clark is asking to be the Lead Plaintiff for a class, so he must satisfy PSLRA's requirements for being so designated.

Plaintiff correctly observes Clark filed a lawsuit in August 2005 that was later consolidated (along with others) into this one, and further observes Clark was the only option trader to file a suit. These facts do not change the Court's conclusions. While Clark filed a lawsuit in August 2005, he did nothing further. Most notably, he made no effort to be designated a lead plaintiff, pursue certification of a class for option traders, object to consolidation of his claims as an option trader with the claims of stockholders, or even direct the Court to the fact that he was "different" from the other plaintiffs in that he was an option trader. As the December 19, 2005, Order observes, "George Clark

10

has not participated in these proceedings since he filed his Complaint. His Complaint provides no information about the losses he allegedly suffered."

The Court is also concerned that PSLRA's notice requirements have not been satisfied insofar as an option class is concerned. The notice requirement allows others who might be better situated to control the litigation to come forth and participate. To the Court's knowledge, the required notice has not been issued.

In conclusion, the Court views the effort to include Clark as an attempt to do now what could/should have been done in late 2005. Having failed to persuade the Court to designate him a co-lead plaintiff, Clark now seeks to accomplish the same result via different means. This is contrary to the PSLRA and will not be allowed.[6]

### B. Rule 23(b)(3)'s Requirements

Plaintiff seeks certification under 23(b)(3), which requires that questions of law or fact predominate over any individual questions and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Amchem Products, Inc., 521 U.S. at 622. Defendants do not contest either element separately from the arguments discussed above, so a brief discussion will suffice.

The predominance inquiry tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation. Id. at 623. Predominance is a test readily met in certain cases alleging securities fraud. Id. at 625. The issues in this case are common to each claimant, namely, the veracity of Defendants' public statements, Defendants' state of mind, the materiality of the statements and loss causation. While there are individual issues (most notably with respect to damages), the common issues are much more significant in scope and of greater importance to the overall litigation. Accordingly, the Court concludes that the common issues regarding Defendants' liability predominate over issues affecting only individual members.

---

[6]Nothing herein is intended to preclude an option trader (including Clark) from filing a suit, complying with the PSLRA, and attempting to certify a class of option traders.

11

To satisfy the superiority prong, the class action must be "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Proceeding as a class action would further the interests of judicial economy. The cost required for litigation of a securities action precludes individual class members from prosecuting their claims on an individual basis. A single proceeding to address the common issues would be more efficient for the parties and the judiciary, and would further insure consistency of results. The Court thus concludes a class action is superior to other methods of litigating the class members' claims.

### III. CONCLUSION

The Court grants in part and denies in part the Motion to Certify Class, and certifies a class defined as follows:

> All purchasers of the common stock of American Italian Pasta Company on or after January 23, 2002, who held shares of the common stock of American Italian Pasta Company on August 9, 2005.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
DATE: March 26, 2007         UNITED STATES DISTRICT COURT